# NEW YORK STATE CLUB ASSOCIATION, INC. *v.* CITY OF NEW YORK ET AL.

No. 86–1836.   Argued February 23, 1988—Decided June 20, 1988

2

WHITE, J., delivered the opinion for a unanimous Court with respect to Parts I, II, and III, and an opinion of the Court with respect to Part IV, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, STEVENS, O'CONNOR, and KENNEDY, JJ., joined. O'CONNOR, J., filed a concurring opinion, in which KENNEDY, J., joined, *post*, p. 18. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 20.

*Alan Mansfield* argued the cause for appellant. With him on the briefs were *Angelo T. Cometa* and *Louis J. Lefkowitz*.

*Peter L. Zimroth* argued the cause for appellees. With him on the brief were *Leonard J. Koerner* and *Fay Leoussis*.*

*Briefs of *amici curiae* urging reversal were filed for the Conference of Private Organizations by *Thomas P. Ondeck;* for the Club Managers Association of America by *John M. Wood* and *David Ferber;* and for the Francisca Club et al. by *Michael H. Salinsky* and *Kevin M. Fong*.

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Robert Abrams*, Attorney General of New York, *O. Peter Sherwood*, Solicitor General, and *Suzanne M. Lyon* and *Elvia Rosales Arriola*, Assistant Attorneys General, joined by the Attorneys General for their respective States as follows: *John Van de Kamp* of California, *W. Cary Edwards* of New Jersey, *Donald J. Hanaway* of Wisconsin, *J. Joseph Curran, Jr.,* of Maryland, *Neil F. Hartigan* of Illinois, *Hubert H. Humphrey III* of Minnesota, *Dave Frohnmayer* of Oregon, *James M. Shannon* of Massachusetts, *Frank J. Kelley* of Michigan, and *Charles Brown* of West Virginia; for the city of Chicago by *Judson H. Miner* and *Ruth M. Moscovitch;* for the city of Los Angeles et al. by *Pamela A. Albers*, and *Vanessa Place;* for the city and county of San Francisco by *Louise H. Renne;* for the Licensing Board of the city of Boston by *Barbara A. H. Smith;* for the American Bar Association by *Robert MacCrate* and *Stark Ritchie;* for the Anti-Defamation League of B'Nai B'rith et al. by *Jill L.*

JUSTICE WHITE delivered the opinion of the Court.

New York City has adopted a local law that forbids discrimination by certain private clubs. The New York Court of Appeals rejected a facial challenge to this law based on the First and Fourteenth Amendments. We sit in review of that judgment.

I

In 1965, New York City adopted a Human Rights Law that prohibits discrimination by any "place of public accommodation, resort or amusement."[1] This term is defined broadly

*Kahn, Justin J. Finger,* and *Jeffrey P. Sinensky;* for the Committees on Civil Rights and Sex and Law of the Association of the Bar of the city of New York by *Robert M. Kaufman, Jonathan Lang, Arthur Leonard, Evelyn F. Cohn,* and *Kay C. Murray;* for the NOW Legal Defense and Education Fund et al. by *Sarah E. Burns, Judith I. Avner,* and *Beverly Gross;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon, Beate Bloch,* and *Nancy J. Bregstein.*

Briefs of *amici curiae* were filed for the American Civil Liberties Union Foundation et al. by *Burt Neuborne, John A. Powell, Steven R. Shapiro, Isabelle Katz Pinzler, Arthur N. Eisenberg, Paul L. Hoffman,* and *Judith Resnik;* and for the Lawyer's Committee for Civil Rights Under Law by *Lloyd N. Cutler, James Robertson, Conrad K. Harper, Stuart J. Land, Norman Redlich, William L. Robinson,* and *Judith Winston.*

[1] The Human Rights Law (Local Law No. 97 of 1965) makes it "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin or sex of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of race, creed, color, national origin or sex or that the patronage or custom thereat of any person belonging to or purporting to be of any particular race, creed, color, national origin, or sex is unwelcome, objectionable or not acceptable, desired or solicited." N. Y. C. Admin. Code § 8–107(2) (1986). The city has also extended the Law's coverage to discrimination against "an otherwise qualified person who is physically or mentally handicapped," § 8–108, and to discrimination

in the Law to cover such various places as hotels, restaurants, retail stores, hospitals, laundries, theaters, parks, public conveyances, and public halls, in addition to numerous other places that are specifically listed. N. Y. C. Admin. Code § 8–102(9) (1986). Yet the Law also exempted from its coverage various public educational facilities and "any institution, club or place of accommodation which proves that it is in its nature distinctly private." *Ibid.* The city adopted this Law soon after the Federal Government adopted civil rights legislation to bar discrimination in places of public accommodation, Civil Rights Act of 1964, Title II, 78 Stat. 243, 42 U. S. C. § 2000a(e).

In 1984, New York City amended its Human Rights Law. The basic purpose of the amendment is to prohibit discrimination in certain private clubs that are determined to be sufficiently "public" in nature that they do not fit properly within the exemption for "any institution, club or place of accommodation which is in its nature distinctly private." As the City Council stated at greater length:

"It is hereby found and declared that the city of New York has a compelling interest in providing its citizens an environment where all persons, regardless of race, creed, color, national origin or sex, have a fair and equal opportunity to participate in the business and professional life of the city, and may be unfettered in availing themselves of employment opportunities. Although city, state and federal laws have been enacted to eliminate discrimination in employment, women and minority group members have not attained equal opportunity in business and the professions. One barrier to the advancement of women and minorities in the business and professional life of the city is the discriminatory practices of certain membership organizations where business

against "individuals because of their actual or perceived sexual orientation," § 8–108.1.

deals are often made and personal contacts valuable for business purposes, employment and professional advancement are formed. While such organizations may avowedly be organized for social, cultural, civic or educational purposes, and while many perform valuable services to the community, the commercial nature of some of the activities occurring therein and the prejudicial impact of these activities on business, professional and employment opportunities of minorities and women cannot be ignored." Local Law No. 63 of 1984, § 1, App. 14–15.

For these reasons, the City Council found that "the public interest in equal opportunity" outweighs "the interest in private association asserted by club members." *Ibid.* It cautioned, however, that it did not purpose "to interfere in club activities or subject club operations to scrutiny beyond what is necessary in good faith to enforce the human rights law," and the amendments were not intended as an attempt "to dictate the manner in which certain private clubs conduct their activities or select their members, except insofar as is necessary to ensure that clubs do not automatically exclude persons from consideration for membership or enjoyment of club accommodations and facilities and the advantages and privileges of membership, on account of invidious discrimination." *Ibid.*

The specific change wrought by the amendment is to extend the antidiscrimination provisions of the Human Rights Law to any "institution, club or place of accommodation [that] has more than four hundred members, provides regular meal service and regularly receives payment for dues, fees, use of space, facilities, services, meals or beverages directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business." N. Y. C. Admin. Code § 8–102(9) (1986). Any such club "shall not be considered in its nature distinctly private." *Ibid.* Nonetheless, the city also stated that any such club "shall be deemed to be in its nature distinctly private" if it is "a corporation incorporated

under the benevolent orders law or described in the benevolent orders law but formed under any other law of this state, or a religious corporation incorporated under the education law or the religious corporations law." *Ibid.* The City Council explained that it drafted the amendment in this way so as to meet the specific problem confronting women and minorities in the city's business and professional world: "Because small clubs, benevolent orders and religious corporations have not been identified in testimony before the Council as places where business activity is prevalent, the Council has determined not to apply the requirements of this local law to such organizations." Local Law No. 63, § 1, App. 15.

Immediately after the 1984 Law became effective, the New York State Club Association filed suit against the city and some of its officers in state court, seeking a declaration that the Law is invalid on various state grounds and is unconstitutional on its face under the First and Fourteenth Amendments and requesting that defendants be enjoined from enforcing it. On cross-motions for summary judgment, the trial court upheld the Law against all challenges, including the federal constitutional challenges. The intermediate state appellate court affirmed this judgment on appeal; one judge dissented, however, concluding that the exemption for benevolent orders violates the Equal Protection Clause because it fails to accord equal protection to similarly situated persons. 118 App. Div. 2d 392, 505 N. Y. S. 2d 152 (1986).

The State Club Association appealed this decision to the New York Court of Appeals, which affirmed in a unanimous opinion. 69 N. Y. 2d 211, 505 N. E. 2d 915 (1987). The court rejected the First Amendment challenge to Local Law 63, relying heavily on the decisions in *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984), and *Board of Directors of Rotary Int'l* v. *Rotary Club*, 481 U. S. 537 (1987). It ruled that any infringement on associational rights is amply justified by the city's compelling interest in eliminating discrimination against women and minorities. In addition, the

Law employs the least restrictive means to achieve its ends because it interferes with the policies and activities of private clubs only "to the extent necessary to ensure that they do not automatically exclude persons from membership or use of the facilities on account of invidious discrimination." 69 N. Y. 2d, at 223, 505 N. E. 2d, at 921. The court denied relief on the equal protection claim without discussing it.

The State Club Association appealed to this Court. We noted probable jurisdiction, 484 U. S. 812 (1987), and we now affirm the judgment below, upholding Local Law 63 against appellant's facial attack on its constitutionality.

## II

The initial question in this case is whether appellant has standing to challenge the constitutionality of Local Law 63 in this Court.[2] We hold that it does.

Appellant is a nonprofit corporation, which essentially consists of a consortium of 125 other private clubs and associations in the State of New York, many of which are located in

_____

[2] The state trial court found that appellant has standing to challenge the validity of the Law, and neither of the other state courts addressed this issue on appeal. Nonetheless, an independent determination of the question of standing is necessary in this Court, for the special limitations that Article III of the Constitution imposes on the jurisdiction of the federal courts are not binding on the state courts. See *Pennell* v. *San Jose*, 485 U. S. 1, 8 (1988). The States are thus left free as a matter of their own procedural law to determine whether their courts may issue advisory opinions or to determine matters that would not satisfy the more stringent requirement in the federal courts that an actual "case" or "controversy" be presented for resolution. U. S. Const., Art. III, § 2. Accordingly, this Court has dismissed cases on appeal from state courts when it appeared that the complaining party lacked standing to contest the law's validity in the federal courts. *Tileston* v. *Ullman*, 318 U. S. 44 (1943) *(per curiam); Braxton County Court* v. *West Virginia ex rel. Tax Comm'rs*, 208 U. S. 192 (1908). And the statement that "[b]y exercising their jurisdiction, state courts cannot determine the jurisdiction to be exercised by this Court," is perhaps all the more applicable to actions brought in state court for declaratory relief. *Poe* v. *Ullman*, 367 U. S. 497, 506 (1961) (plurality opinion).

New York City. In *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977), we held that an association has standing to sue on behalf of its members "when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." See also *Automobile Workers* v. *Brock*, 477 U. S. 274 (1986). Appellees focus on the first part of this test; they read the requirement that the association's members "would otherwise have standing to sue in their own right" as meaning that appellant's member associations must have standing to sue only on behalf of themselves, and not on behalf of anyone else, such as their own individual members.

This reading of *Hunt* is incorrect. Under *Hunt*, an association has standing to sue on behalf of its members when those members would have standing to bring the same suit. It does not matter what specific analysis is necessary to determine that the members could bring the same suit, for the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation. Here, however, the appellant consortium has standing to sue on behalf of its member associations as long as those associations would have standing to bring the same challenge to Local Law 63.[3] In this regard, it is sufficient to note that appellant's member associations would have standing to bring this same suit on behalf of their

---

[3] Appellees' argument to the contrary, based on a footnote in the *Rotary* opinion, is unavailing. The footnote states that Rotary International, "an association of thousands of local Rotary Clubs, can claim no constitutionally protected right of private association." *Board of Directors of Rotary Int'l* v. *Rotary Club*, 481 U. S. 537, 545, n. 4 (1987). But there the larger association had brought suit in its own right *against* one of its member clubs, and was not suing *on behalf of* any of its members, so the passage is inapposite to the situation here.

own individual members, since those individuals "are suffering immediate or threatened injury" to their associational rights as a result of the Law's enactment. *Warth* v. *Seldin*, 422 U. S. 490, 511 (1975); see App. 10, 32, 34–35, 38.[4] Thus the case is properly before us.

## III

New York City's Human Rights Law authorizes the city's Human Rights Commission or any aggrieved individual to initiate a complaint against any "place of public accommodation, resort or amusement" that is alleged to have discriminated in violation of the Law. N. Y. C. Admin. Code § 8–109(1) (1986). The Commission investigates the complaint and determines whether probable cause exists to find a violation. When probable cause is found, the Commission may settle the matter by conciliatory measures, if possible; if the matter is not settled, the Commission schedules a hearing in which the defending party may present evidence and answer the charges against it. After the hearing is concluded, the Commission states its findings of fact and either dismisses the complaint or issues a cease-and-desist order. § 8–109(2). Any person aggrieved by an order of the Com-

---

[4] In light of the foregoing analysis, it is not necessary to consider also whether appellant consortium would have standing to sue directly on behalf of its member associations because those associations themselves are suffering some immediate or threatened injury from the Law. In addition, though appellees do not contest either of the other two parts of the *Hunt* test, those requirements clearly are met in this case. Here the associational interests that the consortium seeks to protect are germane to its purpose: appellant's certificate of incorporation states that its purpose is "to promote the common business interests of its [member clubs]." App. 38. Moreover, appellant's facial challenge to the Law does not require the participation of individual members, since there is complete identity between the interests of the consortium and those of its member associations with respect to the issues raised in this suit, and the necessary proof could be presented "in a group context." *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 344 (1977). See also *Automobile Workers* v. *Brock*, 477 U. S. 274, 287–288 (1986).

mission is entitled to seek judicial review of the order, and the Commission may seek enforcement of its orders in judicial proceedings. § 8–110.

None of these procedures has come into play in this case, however, for appellant brought this suit challenging the constitutionality of the 1984 Law on its face before any enforcement proceedings were initiated against any of its member associations. Although such facial challenges are sometimes permissible and often have been entertained, especially when speech protected by the First Amendment is at stake, to prevail on a facial attack the plaintiff must demonstrate that the challenged law either "could never be applied in a valid manner" or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it "may inhibit the constitutionally protected speech of third parties." *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 798 (1984). Properly understood, the latter kind of facial challenge is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power. *Thornhill* v. *Alabama*, 310 U. S. 88, 97–98 (1940). Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that "every application of the statute created an impermissible risk of suppression of ideas," *Taxpayers for Vincent, supra*, at 798, n. 15, and the second kind of facial challenge will not succeed unless the statute is "substantially" overbroad, which requires the court to find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." 466 U. S., at 801.

We are unpersuaded that appellant is entitled to make either one of these two distinct facial challenges. Appellant conceded at oral argument, understandably we think, that the antidiscrimination provisions of the Human Rights Law

certainly could be constitutionally applied at least to some of the large clubs, under this Court's decisions in *Rotary* and *Roberts.* Tr. of Oral Arg. 11–12. The clubs that are covered under the Law contain at least 400 members. They thus are comparable in size to the local chapters of the Jaycees that we found not to be protected private associations in *Roberts,* and they are considerably larger than many of the local clubs that were found to be unprotected in *Rotary,* some which included as few as 20 members. See *Roberts,* 468 U. S., at 621; *Rotary,* 481 U. S., at 546. Cf. *Village of Belle Terre* v. *Boraas,* 416 U. S. 1, 7–8 (1974). The clubs covered by Local Law 63 also provide "regular meal service" and receive regular payments "directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business." N. Y. C. Admin. Code § 8–102(9) (1986). The city found these two characteristics to be significant in pinpointing organizations which are "commercial" in nature, "where business deals are often made and personal contacts valuable for business purposes, employment and professional advancement are formed." Local Law 63, § 1, App. 15.

These characteristics are at least as significant in defining the nonprivate nature of these associations, because of the kind of role that strangers play in their ordinary existence, as is the regular participation of strangers at meetings, which we emphasized in *Roberts* and *Rotary.* See *Roberts, supra,* at 621; *Rotary, supra,* at 547. It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so. *Hishon* v. *King & Spalding,* 467 U. S. 69, 78 (1984). Although there may be clubs that would be entitled to constitutional protection despite the presence of these characteristics, surely it cannot be said that Local Law 63 is invalid on its face because it infringes the private associational rights of each and every club covered by it.

The same may be said about the contention that the Law infringes upon every club member's right of expressive association. The ability and the opportunity to combine with others to advance one's views is a powerful practical means of ensuring the perpetuation of the freedoms the First Amendment has guaranteed to individuals as against the government. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 460 (1958). This is not to say, however, that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution. *Hishon, supra*, at 78; *Norwood* v. *Harrison*, 413 U. S. 455, 470 (1973); *Railway Mail Assn.* v. *Corsi*, 326 U. S. 88, 93–94 (1945).

On its face, Local Law 63 does not affect "in any significant way" the ability of individuals to form associations that will advocate public or private viewpoints. *Rotary*, 481 U. S., at 548. It does not require the clubs "to abandon or alter" any activities that are protected by the First Amendment. *Ibid.* If a club seeks to exclude individuals who do not share the views that the club's members wish to promote, the Law erects no obstacle to this end. Instead, the Law merely prevents an association from using race, sex, and the other specified characteristics as shorthand measures in place of what the city considers to be more legitimate criteria for determining membership. It is conceivable, of course, that an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion. In the case before us, however, it seems sensible enough to believe that many of the large clubs covered by the Law are not of this kind. We

could hardly hold otherwise on the record before us, which contains no specific evidence on the characteristics of *any* club covered by the Law.

The facial attack based on the claim that Local Law 63 is invalid in all of its applications must therefore fail. Appellant insists, however, that there are some clubs within the reach of the Law that are "distinctively private" and that the Law is therefore overbroad and invalid on its face. But as we have indicated, this kind of facial challenge also falls short.

The overbreadth doctrine is "strong medicine" that is used "sparingly and only as a last resort." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). A law is constitutional unless it is "substantially overbroad." *Id.*, at 615. To succeed in its challenge, appellant must demonstrate from the text of Local Law 63 and from actual fact that a substantial number of instances exist in which the Law cannot be applied constitutionally. Yet appellant has not identified those clubs for whom the antidiscrimination provisions will impair their ability to associate together or to advocate public or private viewpoints. No record was made in this respect, we are not informed of the characteristics of any particular clubs, and hence we cannot conclude that the Law threatens to undermine the associational or expressive purposes of any club, let alone a substantial number of them. We therefore cannot conclude that the Law is substantially overbroad and must assume that "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.*, at 615–616.[5]

Appellant claims, however, that the Law erects an "irrebuttable" presumption that the clubs covered under it are not

---

[5] In making this case-by-case inquiry into the constitutionality of Local Law 63 as applied to particular associations, it is relevant to note that the Court has recognized the State's "compelling interest" in combating invidious discrimination. See, *e. g.*, *Rotary*, 481 U. S., at 549.

private in nature, and contends that its member associations will not be permitted to raise the constitutionality of the Law in individual administrative and judicial proceedings. Cf. *Rotary, supra,* at 547–548, n. 6. Even if this were a correct interpretation of what the Law says—and the decisions below at least suggest the contrary view[6]—it does not affect our analysis. Although the city's Human Rights Commission may not be empowered to consider the constitutionality of the statute under which it operates, under accepted legal principles it would be quite unusual if the Commission "could not construe its own statutory mandate in the light of federal constitutional principles." *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools,* 477 U. S. 619, 629 (1986). And even if this were also true, nothing in the Law purports to preclude judicial review of constitutional claims that may be raised on appeal from the administrative enforcement proceedings. N. Y. C. Admin. Code § 8–110 (1986); *Dayton Christian Schools, supra,* at 629. These opportunities for individual associations to contest the constitutionality of the Law as it may be applied against them are adequate to assure that any overbreadth under the Law will be curable through case-by-case analysis of specific facts.

## IV

Appellant also contends that the exemption in Local Law 63 for benevolent and religious corporations, which deems them to be "distinctly private" in nature, violates the Equal Protection Clause.[7] Since, as just discussed, it has not been demonstrated that the Law affects "in any significant way"

---

[6] In its opinion, the Court of Appeals suggested that the three criteria identified in Local Law 63 are not exclusive but are to be considered in conjunction with other relevant characteristics. 69 N. Y. 2d, at 222, 505 N. E. 2d, at 920–921, citing *United States Power Squadrons* v. *State Human Rights Appeal Bd.,* 59 N. Y. 2d 401, 412–413, 452 N. E. 2d 1199, 1204 (1983).

[7] The Court of Appeals did not separately address the equal protection question other than by affirming the decision of the Appellate Division.

the fundamental interests of any clubs covered by the Law, heightened scrutiny does not apply. See *Lyng* v. *Automobile Workers*, 485 U. S. 360, 365, 366 (1988); *Rotary*, 481 U. S., at 548. On this state of the record, the equal protection challenge must fail unless the city could not reasonably believe that the exempted organizations are different in relevant respects from appellant's members.

As written, the legislative classification on its face is not manifestly without reasoned support. The City Council explained that it limited the Law's coverage to large clubs and excluded smaller clubs, benevolent orders, and religious corporations because the latter associations "have not been identified in testimony before the Council as places where business activity is prevalent." Local Law No. 63, § 1, App. 15. This explanation echoes the logic of the decision in *New York ex rel. Bryant* v. *Zimmerman*, 278 U. S. 63 (1928), which upheld a New York law that exempted benevolent orders from having to file certain documents with the State that must be filed by most other corporations and associations. See N. Y. Civ. Rights Law § 53 (McKinney 1976). The Court rejected a claim that the statute violated the Equal Protection Clause, finding on the evidence before it that the legislative distinction was justified because benevolent orders were judged not to pose the same dangers as other groups that were required to file the documents. *Bryant, supra,* at 73–77. In addition, New York State law indicates that benevolent orders and religious corporations are unique and thus that a rational basis exists for their exemption here. For well over a century, the State has extended special treatment in the law to these associations, and each continues to be treated in a separate body of legislation. See N. Y. Ben. Ord. Law §§ 1–14 (McKinney 1951 and Supp. 1988); N. Y. Relig. Corp. Law §§ 1–437 (McKinney 1952 and Supp. 1988). It is plausible that these associations differ in their practices and purposes from other private clubs that are now covered under Local Law 63. As the Appellate Division in this case pointed out,

the benevolent orders are organized under the relevant law "'solely for the benefit of [their] membership and their beneficiaries,'" and thus are not "public" organizations. 118 App. Div. 2d, at 394, 505 N. Y. S. 2d, at 154, quoting N. Y. Ins. Law § 4501(a) (McKinney 1985). Similarly, religious organizations are "'created for religious purposes'" and are "patently not engaged in commercial activity for the benefit of non-members." 118 App. Div. 2d, at 394–395, 505 N. Y. S. 2d, at 154, quoting N. Y. Relig. Corp. Law § 2 (McKinney 1952).

Appellant contends, however, that the benevolent and religious corporations exempted in the Law are in fact no different in nature from the other clubs and associations that are now made subject to the city's antidiscrimination restrictions. Because the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 439 (1985), appellant contends that the exemption violates the Clause.

In support of its argument, appellant observes that appellees offered no evidence to support the city's position that benevolent and religious groups are actually different from other private associations. Legislative classifications, however, are presumed to be constitutional, and the burden of showing a statute to be unconstitutional is on the challenging party, *not* on the party defending the statute: "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance* v. *Bradley*, 440 U. S. 93, 111 (1979). In a case such as this, the plaintiff can carry this burden by submitting evidence to show that the asserted grounds for the legislative classification lack any reasonable support in fact, but this burden is nonetheless a considerable one. *United States* v. *Carolene Products Co.*, 304 U. S. 144, 154 (1938).

The City Council's explanation for exempting benevolent orders and religious corporations from Local Law 63's coverage reflects a view that these associations are different in kind, at least in the crucial respect of whether business activity is prevalent among them, from the associations on whose behalf appellant has brought suit. Appellant has the burden of showing that this view is erroneous and that the issue is not truly debatable, a burden that appellant has failed to carry. There is no evidence in the record to indicate that a detailed examination of the practices, purposes, and structures of benevolent orders and religious corporations would show them to be identical in this and other critical respects to the private clubs that are covered under the city's antidiscrimination provisions. Without any such showing, appellant's facial attack on the Law under the Equal Protection Clause must founder.

We therefore affirm the judgment below.

*So ordered.*

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY joins, concurring.

I agree with the Court's conclusion that the facial challenge to Local Law 63 must fail. I write separately only to note that nothing in the Court's opinion in any way undermines or denigrates the importance of any associational interests at stake.

The Court reaffirms the "power of States to pursue the profoundly important goal of ensuring nondiscriminatory access to commercial opportunities in our society." *Roberts* v. *United States Jaycees*, 468 U. S. 609, 632 (1984) (O'CONNOR, J., concurring in part and concurring in judgment). But our cases also recognize an "association's First Amendment right to control its membership," acknowledging, of course, that the strength of any such right varies with the nature of the organization. *Id.*, at 635. Balancing these two important interests calls for sensitive tools. As it has been interpreted, Local Law 63 is such a device.

The Law identifies three factors to be used to determine whether a particular club is "distinctly private" for purposes of applying the city's antidiscrimination laws. As the Court notes, however, *ante*, at 15, n. 6, the court below has suggested that the factors identified in Local Law 63 are not exclusive, but are to be considered along with other considerations such as "'size, purpose, policies, selectivity, congeniality, and other characteristics.'" 69 N. Y. 2d 211, 222, 505 N. E. 2d 915, 920–921 (1987) (quoting *Roberts, supra*, at 620). See also *United States Power Squadrons* v. *State Human Rights Appeal Bd.*, 59 N. Y. 2d 401, 412–413, 452 N. E. 2d 1199, 1204 (1983). An association or club thus is permitted to demonstrate that its particular characteristics qualify it for constitutional protection, despite the presence of the three factors specified in Local Law 63. *University Club* v. *City of New York*, 842 F. 2d 37, 41 (CA2 1988) (noting that the three factors in Local Law 63 are not "the only ones relevant to the constitutionality of applying the new definition to [a particular club]"). Moreover, such organizations are provided with an adequate opportunity to raise any constitutional claims in the administrative proceedings through which Local Law 63 is applied. See *ibid.* See also *ante*, at 15.

In a city as large and diverse as New York City, there surely will be organizations that fall within the potential reach of Local Law 63 and yet are deserving of constitutional protection. For example, in such a large city a club with over 400 members may still be relatively intimate in nature, so that a constitutional right to control membership takes precedence. Similarly, there may well be organizations whose expressive purposes would be substantially undermined if they were unable to confine their membership to those of the same sex, race, religion, or ethnic background, or who share some other such common bond. The associational rights of such organizations must be respected.

But as the Court points out, *ante,* at 11–12, 13–14, and indeed, as appellant conceded, Tr. of Oral Arg. 11–12, the ex-

istence of such protected clubs does not mean that Local Law 63 cannot be applied to other clubs. Predominately commercial organizations are not entitled to claim a First Amendment associational or expressive right to be free from the anti-discrimination provisions triggered by the law. Because Local Law 63 may be applied constitutionally to these organizations, I agree with the Court that it is not invalid on its face.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the judgment of the Court, and join all except Part IV of its opinion. I note that Part III assumes for purposes of its analysis, but does not hold, the existence of a constitutional right of private association for other than expressive or religious purposes.

With respect to the equal protection issue discussed in Part IV of the opinion, I do not believe that the mere fact that benevolent orders "are unique," *ante*, at 16, suffices to establish that a rational basis exists for their exemption. As forgiving as the rational-basis test is, it does not go that far. There must at least be some plausible connection between the respect in which they are unique and the purpose of the law.

It is true, as appellant urges, that under the New York State statute to which Local Law 63 technically refers, no characteristic *must* be possessed in order to qualify as a "benevolent order" except the characteristic of being listed by the legislature in § 2.* See N. Y. Ben. Ord. Law § 2

---

*The Court, *ante*, at 17, relies upon the Appellate Division's statement that benevolent orders are organized " " "solely for the benefit of [their] membership and their beneficiaries." ' " If I thought this to be an interpretation of New York law, I would honor it. In fact, however, it seems plain to me that the Appellate Division was not interpreting one section but misciting another. The language is quoted (with appropriate citation) from a provision of New York law dealing not with benevolent orders but with "fraternal benefit societies." N. Y. Ins. Law § 4501(a) (McKinney

(McKinney 1951 and Supp. 1988).   In fact, however, all the organizations that have been listed—or at least all I am familiar with—share the characteristic of being what might be called lodges or fraternal organizations.   They include, for example, the American Legion, the Jewish War Veterans of the United States, the Catholic War Veterans, the Disabled American Veterans, AMVETS, the. Veterans of Foreign Wars, various orders of Masons, the Independent Order of Odd Fellows, the Loyal Order of Moose, the Knights of Columbus, the Improved Benevolent and Protective Order of Elks of the World, the Nobles of the Mystic Shrine, the Ancient Order of Hibernians, and the Knights of Malta.   When the City Council stated that it had heard no testimony that "benevolent orders" were "places where business activity is prevalent," Local Law No. 63, § 1, App. 15, I think it meant by "benevolent orders" organizations of that sort.   While the fit between lodge and fraternal type organizations and the present or future content of § 2 of. the New York State law may not be perfect, we do not require that for ordinary equal protection analysis.   See, *e. g.*, *Vance* v. *Bradley*, 440 U. S. 93, 108 (1979).   I am content that it was rational to refer to that law as a means of identifying a category composed almost entirely of such associations; and that it was rational to think that such organizations did not significantly contribute to the problem the City Council was addressing.   A lodge is not likely to be a club where men dine with clients and conduct business.   Appellant introduced no evidence to the contrary.

---

1985).   The two are quite different, although an organization can qualify as both.   See §§ 4501, 4502.   In any event, even if benevolent orders were required to possess the characteristic of being "solely for the benefit of [their] membership and of their beneficiaries," that would not distinguish them from appellant's organizations.   *All* of the clubs covered by Local Law 63 seemingly meet that description, since it establishes an exception to the "distinctly private" exemption of the New York City Human Rights Law (Local Law No. 97 of 1965), N. Y. C. Admin. Code § 8–107(2) (1986).